IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| BRADLEY PATRICK DONOHUE, | Case No. 2:18-cv-804-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| AMY HUGHES, R.N.; STEVE SHELTON, M.D.; GARTH GULICK, M.D.; J. DAFOE, R.N.; A. CLEMENTS, R.N.; and J. WILLIAMS, R.N. | |
| Defendants. | |

Juan C. Chavez, P.O. Box 5248, Portland, OR 97208. Of Attorneys for Plaintiff.

Ellen F. Rosenblum, Attorney General, and Andrew D. Hallman, Assistant Attorney General, OREGON DEPARTMENT OF JUSTICE, 1162 Court Street NE, Salem, OR 97301. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff Bradley Donohue was an inmate in the custody of the Oregon Department of Corrections ("ODOC") from February 11, 2011 through September 14, 2016. During most of that time, he was incarcerated at the Snake River Correctional Institution ("SRCI"). Defendants Amy Hughes, Steve Shelton, Garth Gulick, J. Dafoe, A. Clements, and J. Williams (collectively, "Defendants") are all employed by the ODOC and serve on its medical staff. Mr. Donhue brings

this action under 42 U.S.C. § 1983, raising a claim under the Eighth Amendment, made applicable to the states by the Fourteenth Amendment. Mr. Donohue alleges that Defendants were deliberately indifferent to his serious medical needs relating to both his right and left shoulders. Defendants have moved for summary judgment. For the reasons explained below, the Court grants Defendants' motion.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

### A.  Mr. Donohue's Right Shoulder

Mr. Donohue was incarcerated at SRCI from 2012 to 2016. He has a history of right shoulder instability. Dr. Garth Gulick, a physician at SRCI, diagnosed Mr. Donohue with degenerative shoulder disease in late 2012. On January 18, 2016, while still incarcerated at

SRCI, Mr. Donohue underwent a successful "Bankart repair" of his right shoulder. At Mr. Donohue's first follow up appointment, Dr. Foote, who performed the surgery, recommended that Mr. Donohue engage in light exercise of his right shoulder to promote healing. A few weeks later, in early February, Mr. Donohue caught his arm in a cell door and re-injured his right shoulder. Mr. Donohue received conflicting instructions about how properly to care for his right shoulder after he re-injured it. Mr. Donohue alleges that Defendant Hughes, a nurse, told him to refrain from light exercise, on Dr. Foote's recommendation. But Mr. Donohue also alleges that Dr. Foote later told him that he had never spoken to Defendant Hughes. ECF 45 at 44. Dr. Gulick told Mr. Donohue to continue his program of light exercise. Dr. Gulick further reported that he heard from Dr. Foote that Mr. Donohue should do a "hanging arm" exercise, but not any other exercises.

Mr. Donohue met with Dr. Foote again on March 10, 2016 for his next follow-up appointment. Mr. Donohue alleges that, at this appointment, Dr. Foote told him that he needed to begin physical therapy ("PT") in addition to continuing his exercise program. ECF 46 ¶ 18. Medical records reflect that Dr. Foote advised Mr. Donohue to begin an exercise program incorporating a "theraband." ECF 30 at 63. Dr. Foote instructed Mr. Donohue to "work on [range of motion] exercises on his own." *Id.* During the next six weeks, Mr. Donohue completed the theraband program three times but declined to complete it on three other occasions. He went to his next appointment with Dr. Foote on May 31, 2016. Dr. Foote recommended performing an MRI of Mr. Donohue's right shoulder and having him continue his exercise program. Dr. Foote also said that supervised PT "would be beneficial." ECF 30 at 51. The next day, the ODOC's Therapeutic Level of Care Committee ("TLCC") recommended assessing the functionality of Mr. Donohue's right shoulder before approving Dr. Foote's recommendations. Dr. Gulick

examined Mr. Donohue's right shoulder on June 6, and two days later the TLCC approved the right shoulder MRI and supervised PT.

Mr. Donohue received a right shoulder MRI on July 13, 2016. Two weeks later, Dr. Foote reviewed the MRI, and Dr. Gulick scheduled Mr. Donohue for a supervised PT appointment. Mr. Donohue attended PT at St. Alphonsus Rehabilitation Services on August 9, 2016. The physical therapist evaluated Mr. Donohue and recommended one day of supervised PT for his right shoulder, which Mr. Donohue completed at St. Alphonsus that day. ECF 30 at 49. Mr. Donohue did not receive any further treatment for his right shoulder before his release in September 2016.

**B.  Mr. Donohue's Left Shoulder**

Mr. Donohue also has a history of problems with his left shoulder—he has suffered from "consistent pain" in his left shoulder since 2013. ECF 46 ¶ 9. Dr. Gulick acknowledged that Mr. Donohue's left shoulder is "significantly symptomatic." ECF 30 ¶ 6. Mr. Donohue first complained of left shoulder pain in March 2014 and stated that it had been painful for about a year. The pain continued into 2015. Mr. Donohue requested a left shoulder MRI twice in February and March of that year, but the TLCC denied the requests because Mr. Donohue "could lift his left arm 45 degrees above horizontal and had significant muscle." In addition, Mr. Donohue alleges that Dr. Gulick "constantly told [him] over the years" that he would receive no further treatment so long as he could "eat, clothe, and bathe" himself. Mr. Donohue also alleges that Dr. Gulick told him that this was the policy of his boss, Dr. Shelton. ECF 45 at 39.

Mr. Donohue had two appointments with Dr. Peterson, an orthopedic specialist in June and July 2015. After both visits, Dr. Peterson recommended scheduling a left shoulder MRI. Mr. Donohue twice requested a left shoulder MRI based on Dr. Peterson's recommendations. The TLCC was reluctant to order a left shoulder MRI before Mr. Donohue had surgery to repair

his right shoulder. When he examined Mr. Donohue's left shoulder, Dr. Gulick noticed some rotator tendinitis. After more examination, however, Dr. Gulick determined Mr. Donohue's left shoulder function to be "excellent." ECF 30 ¶ 29. Ultimately, the TLCC rejected Mr. Donohue's requests and decided simply to keep monitoring Mr. Donohue's left shoulder. *Id.* ¶ 28. When questioned about why the TLCC went against Dr. Peterson's recommendations, Dr. Shelton explained that there were "no medical findings in Peterson's report to support that MRI on the left shoulder at this point in time" and that Mr. Donohue had yet to undergo "an appropriate medical workup" or "evaluation." ECF 45 at 60. Ultimately, the TLCC decided only to continue to monitor Mr. Donohue's left shoulder. *Id.* at 58.

In January 2016, at a pre-operative evaluation, Dr. Foote noted left shoulder instability and recommended an MRI to see how severe was the damage. *Id.* ¶ 30. The TLCC rejected Mr. Donohue's request the next day and again recommended waiting until after the right shoulder surgery. *Id.* ¶ 31. About a month later, at Mr. Donohue's first post-surgery follow-up appointment, Dr. Foote recommended "consider[ing] a left shoulder MRI." *Id.* ¶ 34. Two weeks later, in early February, the TLCC decided against ordering an MRI until after Mr. Donohue had recovered from his right shoulder surgery and re-injury. *Id.* at 46. Mr. Donohue did not receive any further treatment for his left shoulder before his release in September 2016.

## DISCUSSION

### A.  Defendants Hughes, Dafoe, Clements, and Williams

To prevail on an Eighth Amendment claim under § 1983 against a specific defendant, a plaintiff must show for that defendant that he or she personally participated in the deprivation of the plaintiff's rights. *See Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). In the Ninth Circuit, "a prison administrator can be liable for deliberate indifference to a prisoner's medical

needs if he knowingly fail[s] to respond to an inmate's requests for help." *Peralta v. Dillard*, 744
F.3d 1076, 1086 (9th Cir. 2014) (en banc).

Defendant Hughes was a medical services manager at SRCI. She was in contact with
Dr. Foote after Mr. Donohue's right shoulder surgery about Mr. Donohue's post-surgery
physical therapy program. ECF 30 ¶ 39. Defendant Hughes also issued the initial response to
Mr. Donohue's grievance about the denial of his left shoulder MRI. ECF 31 ¶ 20. Defendant
Dafoe responded to Mr. Donohue's second level grievance appeal on that same issue. *Id.* The
record does not include any more detail on the circumstances of these denials. Taken as a whole,
the record "could not lead a rational trier of fact to find for [Mr. Donohue]." *Matsushita*, 475
U.S. at 587. The issuances of the initial and second level denials of Mr. Donohue's grievance
about his left shoulder MRI do not establish a genuine issue for trial regarding whether
Defendants Hughes or Dafoe personally participated in depriving Mr. Donohue of his rights.

Nor does Defendant Hughes's contact with Dr. Foote support an Eighth Amendment
claim against Defendant Hughes. Hughes allegedly relayed Dr. Foote's advice to stop the light
shoulder exercises after Mr. Donohue re-injured his right shoulder in February post-surgery.
ECF 45 at 44. She also communicated with Dr. Foote's office several times after Mr. Donohue's
first follow-up appointment in early March. These communications show that Hughes was
involved in Mr. Donohue's medical care, but the record contains no allegations that Hughes ever
denied Mr. Donohue medical care.

Mr. Donohue alleges that Nurse Williams denied him emergency medical service when
Mr. Donohue dislocated his right shoulder in 2014. ECF 45 at 37. But Mr. Donohue
acknowledges that "[t]he present case does not raise his pre-surgery treatment." ECF 44 at 16.
He does not allege that Nurse Williams was involved in denying him care for his right shoulder

post-surgery or his left shoulder at any time. He alleges only that she denied him care in 2014, before his right shoulder surgery. Mr. Donohue cannot maintain his Eighth Amendment claim against Defendant Williams.

Mr. Donohue argues that Defendant Clements "managed medical services during the relevant period." ECF 44 at 16. But Mr. Donohue does not allege that Defendant Clements was personally involved in any decisions about Mr. Donohue's treatment or refused any specific requests. Defendant Clements's position as manager of medical services is not equivalent to a knowing failure to respond to Mr. Donohue's requests for help. *See Peralta*, 744 F.3d at 1086. Mr. Donohue does not have an Eighth Amendment claim against Defendant Clements.

**B.  Defendants Gulick and Shelton**

**1.  Legal Standard**

The government has an obligation "to provide medical care to those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Deliberate indifference to serious medical needs constitutes unnecessary and wanton infliction of pain, which violates the Eighth Amendment. *Id.* at 104. In a prison context, however, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106. To state a claim relating to medical care under § 1983, a prisoner must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* Allegations that a medical professional was negligent in diagnosing or treating a medical condition do not state a valid claim of medical mistreatment under the Eighth Amendment. *Id.*

To establish an Eighth Amendment violation under § 1983, a prisoner must satisfy "both the objective and subjective components of a two-part test." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir.2002)). First, the plaintiff must show "'a serious medical need' by demonstrating that 'failure to treat a prisoner's

condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir.2006) (quoting *Estelle*, 429 U.S. at 104). Second, he must demonstrate that the prison official "acted with deliberate indifference in doing so." *Toguchi*, 391 F.3d at 1057 (citation and quotation marks omitted).

Deliberate indifference may be shown "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Jett*, 439 F.3d at 1096 (citation and quotation marks omitted). A "claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Therefore, a defendant is liable if he knows that a plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842. For example, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

A "difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Toguchi*, 391 F.3d at 1058. To rise to the level of deliberate indifference, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). Under this

standard, a medical decision declining to order an x-ray ordinarily does not represent cruel and

unusual punishment but is a matter for medical judgment. *Estelle*, 429 U.S. at 107.

    **2. Analysis**

        **a. Mr. Donahue's Right Shoulder**

        Mr. Donohue alleges that Drs. Gulick and Shelton violated his Eighth Amendment rights

by not scheduling him for supervised physical therapy until August 2016, much later than the

recommended six weeks after his right shoulder surgery in January. Mr. Donohue also alleges

that he should have had more than one supervised PT appointment, based on the

recommendation of the physical therapist who saw him in August. Mr. Donohue's Eighth

Amendment claim fails because neither action demonstrates that Drs. Gulick and Shelton "acted

with deliberate indifference." *Toguchi*, 391 F.3d at 1057.

        Mr. Donohue relies on the testimony of Dr. Peterson, an orthopedic specialist, to contend

that he should have had supervised PT within six weeks of his January 2016 surgery.

Dr. Peterson testified that six weeks after a Bankart repair, patients "start physical therapy for

rehabilitation of that shoulder." ECF 45 at 53. He did not specify whether he was referring to

supervised or unsupervised PT; it is unclear from his testimony whether Dr. Peterson believed

that Mr. Donohue should have began supervised PT earlier. About six weeks after

Mr. Donohue's surgery, Dr. Foote, who performed the surgery, recommended that Mr. Donohue

begin theraband exercises but did not mention supervised PT. Drs. Shelton and Gulick followed

that recommendation, and Mr. Donohue started the theraband exercises. Dr. Foote eventually

recommended supervised PT on May 31, 2016, a recommendation which Drs. Gulick and

Shelton also followed. There is no conflict between the opinions of Dr. Peterson and Dr. Foote

about the appropriate timing of supervised PT. But even if there were, it would only be a

"difference of opinion . . . between medical professionals . . .concerning what medical care is appropriate," which falls short of deliberate indifference. *Toguchi*, 391 F.3d at 1058.

There is also no evidence that Drs. Gulick and Shelton ignored recommendations for additional supervised PT sessions. In fact, Mr. Donohue's evidence shows that the physical therapist who saw him in August did not recommend any further supervised PT. The physical therapist explained that the "expected length of this episode of skilled therapy services required to address [Mr. Donohue's] condition is estimated to be 1 day." ECF 45 at 9. Mr. Donohue completed the recommended PT session that same day. The physical therapist told Mr. Donohue that he would keep improving if he continued his exercise program consistently but did not mention needing any further supervised PT. ECF 30 at 39. Thus, no rational trier of fact could find that Drs. Gulick and Shelton acted with deliberate indifference by not providing earlier or additional sessions of supervised PT.[1]

### b. Mr. Donahue's Left Shoulder

#### i. Statute of Limitations

Because 42 U.S.C. § 1983 and most related federal civil rights statutes have no independent statute of limitations, state law provides the limitations period for commencement of § 1983 actions. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007). Courts treat a claim under § 1983 as a personal injury action for purposes of determining the applicable statute of limitations. *Id.* Oregon's general tort statute provides a two-year statute of limitations. *See* Or. Rev. Stat.

---

[1] A plaintiff may not recover money damages from an individual state official unless a plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A court has discretion to decide which of the two prongs of the qualified immunity analysis to address first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because the Court finds no Eighth Amendment violation, the Court need not further address the issue of qualified immunity.

§ 12.110(1). Thus, the applicable statute of limitations for Mr. Donohue's § 1983 claim is two years. *See, e.g.*, *Sain v. City of Bend*, 309 F.3d 1134, 1136 (9th Cir. 2002); *Shepard v. City of Portland*, 2011 WL 5282607 (D. Or. Oct. 31, 2011) at *14. The two-year statute of limitations is tolled, however, "while an [incarcerated person] completes the mandatory exhaustion process." *Brown v. Valoff*, 422 F.3d 926, 943 (9th Cir. 2005).

Defendants argue that Mr. Donohue's claim regarding the denial of an MRI for his left shoulder is barred by the two-year statute of limitations. The TLCC denied Mr. Donohue's request for a left shoulder MRI on February 10, 2016. ECF 30 ¶ 38. Mr. Donohue filed an administrative grievance with the ODOC the next day and exhausted the administrative process on May 9, 2016. He filed this lawsuit on May 8, 2018—more than two years after the TLCC denied his MRI request, but within two years after Mr. Donohue exhausted the mandatory administrative grievance process. Thus, the question is whether the statute of limitations was tolled while Mr. Donohue was moving through ODOC's administrative grievance process.

Defendants contend that the statute of limitations was not tolled because Mr. Donohue was not in custody *when he filed the complaint* and therefore the administrative grievance process was not mandatory. That argument misconstrues the relevant time—what matters is that Mr. Donohue was in custody *when he started the grievance procedure*. At that time, the administrative grievance process *was* mandatory. Mr. Donohue could not have filed his complaint earlier than May 9, 2016 because "a prisoner may *not* proceed to federal court while exhausting administrative remedies." *Brown*, 422 F.3d at 942 (emphasis in original). The Court need not address Mr. Donohue's "continuing violations" argument because the Court finds that the statute of limitations for the left shoulder aspect of his § 1983 claim began to run on May 9, 2016. Thus, Mr. Donohue's claim regarding his left shoulder, filed on May 8, 2018, is timely.

### ii. Eighth Amendment Violation

Mr. Donohue alleges that Defendants acted with deliberate indifference when they denied his request for a left shoulder MRI in February 2016. In his deposition, Mr. Donohue stated that the TLCC denied his request for a left shoulder MRI seven times, a fact which Defendants do not dispute. Defendants also concede that Dr. Peterson twice recommended a left shoulder MRI. Dr. Gulick and the TLCC, however, decided not to order a left shoulder MRI. The TLCC "recommended further observation of the left shoulder while [Mr. Donohue] recovered from his right shoulder surgery." ECF 30 at 8. Even though Dr. Gulick's course of treatment went against Dr. Peterson's recommendations, there is no evidence that foregoing a left shoulder MRI was "medically unacceptable under the circumstances." *Jackson*, 90 F.3d at 332.

Dr. Gulick examined Mr. Donohue's left shoulder in September 2015 and "noted [that] the left shoulder has rotator tendinitis [sic] but decent function was evident." ECF 30 ¶ 28. One month later, Dr. Gulick examined Plaintiff's left shoulder again and found that "no MRI was needed" because Mr. Donohue's left shoulder function was "excellent." *Id.* ¶ 29. Dr. Shelton explained that the TLCC recommended following Mr. Donohue's left shoulder symptoms longer before ordering an MRI. ECF 45 at 58. The record also does not suggest that waiting for Mr. Donohue to recover from re-injuring his right shoulder was "in conscious disregard of an excessive risk" to Mr. Donohue's health. *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016). The choice to wait to order a left shoulder MRI does not rise to the level of deliberate

indifference.[2] *See Estelle*, 429 U.S. at 107 (holding that denying a request for an x-ray is normally not deliberate indifference).[3]

**CONCLUSION**

Defendants' motion for summary judgment (ECF 29) is GRANTED.

**IT IS SO ORDERED**.

DATED this 6th day of May, 2020.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

[2] The Court is concerned by Mr. Donohue's allegations that Dr. Gulick told Mr. Donahue that he would receive no treatment so long as he could eat, clothe, and bathe himself, allegations that the Court accepts as true for the purposes of Defendants' summary judgment motion. Despite this troublesome allegation, there is no evidence in the record that Defendants failed to take reasonable measures to abate a substantial risk of serious harm. *Farmer*, 511 U.S. at 842.

[3] The Court also need not address Defendants' qualified immunity argument regarding Mr. Donohue's left shoulder issues. *See* n.1, *supra*.